IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUBMIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ) <br> AMY FARROW ) <br> 637 Willow Way, Apt. B ) <br> Glenolden, PA  19036 ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NP PRECISION INC. ) <br> 5 Horne Drive ) <br> Folcroft, Pennsylvania  19032-23 ) <br> ) <br> Serve: Nicholas Emper ) <br>       5 Horne Drive ) <br>       Folcroft, PA  19032-23, ) <br> ) <br> and ) <br> ) <br> KENNETH NARZIKUL ) <br> 658 N. Heilbron Drive ) <br> Media, PA  19063 ) <br> ) <br> and ) <br> ) <br> SANDRA ROSCH NARZIKUL ) <br> 658 N. Heilbron Drive ) <br> Media, PA  19063 ) <br> ) <br> and ) <br> ) <br> OAKMONT HOLDINGS, L.P. ) <br> 658 N. Heilbron Drive ) <br> Media, PA  19063 ) <br> ) <br> and ) <br> ) <br> Oakmont Management, LLC ) <br> 658 N. Heilbron Drive ) | Civil Case No. 12-447 (RJL) <br><br> FIRST AMENDED COMPLAINT <br> FOR VIOLATIONS OF THE <br> FALSE CLAIMS ACT, 31 <br> U.S.C §§ 3729, *ET SEQ.* <br><br> <u>FILED UNDER SEAL</u> <br><br> JURY TRIAL DEMANDED |

Media, PA  19063 )
)
and )
)
P-R FINISHING, INC )
2000 Market Street 10th FL )
Philadelphia, PA  19103-0 )
)
Defendants. )
)

## FIRST AMENDED COMPLAINT

1.     *Qui tam* relator Amy Farrow ("Farrow" or "Relator"), by her attorney,

individually and on behalf of the United States of America, file this first amended complaint

against NP Precision Inc. ("NP"), Kenneth Narzikul ("Narzikul), and Sandra Rosch Narzikul

("Rosch"), Oakmont Holdings, L.P. ("Oakmont L.P."), Oakmont Management, LLC ("Oakmont

LLC"), and P-R Finishing Inc. ("P-R") collectively the "Defendants."

2.     NP has approximately $33 million dollars in open contracts for work performed in

the assembly of transmissions, rotors, and landing gears of which approximately $25,000,000 of

the contract value represents direct engagements NP has with the federal government and

$8,359,605 of which NP acts as a subcontractor to contractors of the federal government. Yet,

NP chronically fails to perform on its contracts. Defendants embezzle progress payments

earmarked for NP's subcontractors. Defendants engaged – and are likely still engaging – in

outrageous violations of law and contract.

3.     Amy Farrow ("Relator") joined NP lured by the promise of being able to earn a

living while working for a company that had an important mission of providing the U.S.

government and military with needed equipment. Like the government, the Relator expected NP

to be led by professionals who competently executed on its contracts. However, upon Narzikul's

request for the Realtor's assistance in preparing for an audit conducted by the Defense Contract Audit Agency ("DCAA") the Relator witnessed and observed shocking misconduct.

4.      Among other things, the Relator observed Defendants engage in numerous acts of intentional fraud, embezzlement, and breach of contract. Narzikul and Rosch perpetuated the embezzlement scheme by presenting forged progress payment checks to DCAA auditors that allegedly went to NP's subcontractors. However, progress payment funds, paid to NP by the federal government, never reached NP's subcontractors in full.  Instead, the funds that NP, Narzikul and Rosch failed to pay its subcontractors went directly to Narzikul himself or his shell corporations and partnerships like Oakmont L.P, Oakmont LLC and P-R Finishing Inc. Narzikul and Rosch presented forged checks and invoices to DCAA auditors in order to sustain the ebb of progress payments flowing from the government into Narzikul and Rosch's possession.

5.      Among the fraudulent actions taken by the Defendants, NP, Narzikul and Rosch prepared and held checks to create the illusion to DCAA auditors that NP's subcontractors had been paid when they had not been paid; NP fraudulently entered into contracts with the government where the contract prohibited a felon convicted of defense contracting fraud from being a party to the contract; Narzikul, Rosch and NP fraudulently contended that NP was a woman-owned, small business; and Narzikul and Rosch falsified NP's banking records in order to qualify for government contracts.  Even more egregious, Kenneth Narzikul and Sandra Rosch Narzikul embezzled and stole progress payments by dispersing funds from the progress payments to P-R Finishing Inc. and Oakmont L.P., whose general partner, Oakmont LLC, is owned by Kenneth Narzikul.  Instead of paying subcontractors with funds from government progress payments, Narzikul and Rosch funneled progress payment funds into P-R, Oakmont

L.P., Oakmont LLC, and even into Narzikul's own personal bank account. The payments to these entities temporally coincided with NP's receipt of progress payments from the government.

6.      The foregoing misconduct had a direct material impact on NP's performance of its contracts with the government.  Orders from the government and government contractors were chronically never met, while Defendants continued to use progress payments for NP's operating expenses, unrelated contractual engagements, and personal use.  The withholding of progress payments to subcontractors caused NP's contractual duties to be delayed or altogether prevented. The misconduct prevented subcontractors from performing on their contracts with NP because they refused to do work that they were not being paid to do. This in turn rendered NP unable to fully deliver, and in some cases deliver at all, on its commitments to the government.

7.      The Relator realized the extent of the fraudulent activity and the inherent wrong in failing to supply the United States military with needed equipment. The Relator repeatedly asked Narzikul and Rosch for proof of payment to subcontractors.

8.      When the Relator learned about NP's practices during preparation for the DCAA April 2011 audit, she informed Narzikul that she could not see herself continuing to work with NP if the fraudulent conduct persisted. However, evidenced by conduct, Defendants have not changed their practices.

9.      The Relator began to investigate and document the Defendants' misconduct.  The Relator asked Nick Emper ("Emper"), president at NP, what the government rules were regarding progress payments. The Relator meticulously documented the ongoing, escalating, and shocking misconduct she witnessed as an employee of NP.  Given, the Relator's role within the

organization, she also had access to documents that showed how the Defendants' fraudulent conduct dated back before her acceptance of employment in April 2010.

10.     When Narzikul thought the Relator was complicit in his actions by helping him mislead the DCAA auditors, Narzikul gave the Relator a raise and a promotion. Motivated, at least in part, by the Relator's investigation, protest and disclosures, Narzikul demoted the Relator by making her an "independent contractor" and expressed his intent to "phase out" her position. Due to Narzikul's refusal to reinstate the Relator to her former position, Farrow was compelled to resign on April 3, 2012.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a).  The Relator's federal causes of action for unlawful retaliation are authorized by the 31 U.S.C. § 3730(h).

12.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because NP transacts business in this judicial district.  NP has conducted more than thirty-six (36) transactions with the federal government in this judicial district worth more than $33 million.

## THE PARTIES

13.     The Relator is a citizen of the United States.  The Relator brings this action for violations of the federal False Claims Acts on behalf of themselves and the United States Government pursuant to 31 U.S.C. § 3729 *et seq*.  Amy Farrow is a human resources consultant who works for NP Precision Inc.  The Relator meets the definition of an original source as defined under 31 U.S.C. § 3730(e)(4)(B).  Specifically, the Relator voluntarily disclosed to the

Government the information that forms the basis of this Complaint prior to any public disclosure under 31 U.S.C. §3730(e)(4)(A).

14.     NP is a Pennsylvania for-profit corporation; its headquarters are at 5 Horne Drive, Folcroft, Pennsylvania 19032.

15.     Kenneth Narzikul is the owner, president and chief executive officer of NP. Narzikul resides at 658 N. Heilbron Drive, Media, Pennsylvania 19063.

16.     Sandra Rosch Narzikul is Narzikul's wife. Rosch does bookkeeping work for NP from her home and was formerly on all bank signatory forms and ownership records of NP. She resides at 658 N. Heilbron Drive, Media, Pennsylvania 19063.

17.     Oakmont Holdings, L.P. is a Pennsylvania partnership with an address at 658 N. Heilbron Drive, Media, Pennsylvania 19063, Narzikul's home address, whose general partner is Oakmont Management, LLC.

18.     Oakmont Management LLC is registered with the Pennsylvania Department of State and maintains a registered office at 658 N. Heilbron Drive, Media, Pennsylvania 19063, which is Narzikul's home address.  Narzikul is a member of Oakmont Management LLC.

19.     P-R Finishing Inc. is a Pennsylvania corporation with a registered office at 2000 Market Street 10th Floor, Philadelphia, Pennsylvania, 19103.  The President of P-R Finishing, Inc. is Kenneth Narzikul.

## FACTUAL ALLEGATIONS

### Work History and Background

20.     Farrow worked at NP from in or about April 2010 to April 3, 2012.

21.   Farrow entered NP as an administrative assistant. During or after the DCAA's audit in April 2011, Narzikul promoted Farrow to office manager and raised her salary to $60,000.

22.   Farrow handled a range of administrative tasks including responding to various vendors regarding payments and payroll.

23.   During and after the audit, Farrow requested Narzikul and Rosch to provide proof of payment to NP's subcontractors.

24.   At some point after requesting proof of payment and after making disclosures to Narzikul regarding the inaccurate information provided to DCAA auditors, Narzikul demoted Farrow to an "independent contractor" as a human resources consultant.

25.   After the DCAA audit, Narzikul removed most of Farrow's duties including payroll.

26.   Narzikul still directed Farrow's employment in the same manner as he did when she was an employee.

27.   Narzikul planned to "phase out" Farrow's position at NP.

28.   Upon Narzikul's refusal to reinstate Farrow to her former position, Farrow resigned from NP on April 3, 2012.

**About NP**

29.   NP is a Pennsylvania corporation headquartered in Folcroft, Pennsylvania. NP has conducted at least thirty-six (36) transactions worth more than $33 million in business with the federal government in Washington, D.C.

30.     NP's primary business is contracting with the Department of Defense ("DOD").

NP provides manufacturing, fabricating, contract machining, non-destructive testing, paint and

assembly of major military rotary and fixed-wing components. NP specializes in the machining

and assembly of close tolerance components along with the overhaul and repair of prime sub-

assemblies of transmissions, rotors and landing gear for the aerospace, defense and weapons

system industries. NP is also a long-term supplier of critical flight safety parts for military and

civilian helicopters direct to the United States Government as well as a prime supplier to the

Boeing company and others.

31.     NP has a single machine shop in Folcroft, Pennsylvania.  NP employs about 30

people.  Since 2007, NP has received more than $33,000,000 in government contracts though

some sources differ on that amount.

**About NP's contracts**

32.     NP's contracts focus on supplying the United States military with critical flight

safety parts for U.S. military helicopters.

33.     The contracts at issue have the identifiers SPRA1-12-C-0030 with the Defense

Logistics Agency, W58RGZ-08-0054 with US Army Aviation and Missile Command,

W58RGZ-08-0038 with US Army Aviation & Missile Command, FA8203-08-C-0086 with Hill

Air Force Base, and contract FA8203-08-C-0064 with Hill Air Force Base.  They are standard

firm-fixed price contracts with firm delivery dates.

34.     In addition to these contracts, there are several other instances where NP has

failed to perform or adequately perform on its contracts with the federal government.

35.     NP's open contracts with the government represent a total value of approximately $33 million, though available sources vary somewhat on the exact number.

36.     The contracts are definitive, but were not competitively bid as the contracts listed NP as a woman-owned small business ("WOSB").

37.     NP's open contracts with the Federal Government include contracts with US Army and Missile Command ("AMSAM"), Defense Logistics Agency, Hill Air Force Base ("H.A.F.B."), Robins Air Force Base (R.A.F.B.), and Naval Inventory Control Point ("NAVICP").

38.     NP's open contracts as a subcontractor to the federal government include contracts with Boeing, Colombia Helicopter ("Columbia"), Logistic Specialties, Inc. ("LSI"), and Sikorsky.

**The Relator assists Narzikul and Rosch in preparing for an audit by the DCAA.**

39.     In April 2011, Kenneth Narzikul, owner and chief executive officer of NP, approached the Relator for her assistance in preparing for an audit conducted by the DCAA.

40.     The Relator learned that NP continually billed the government for what are called "progress payments," payments based on the company's progress made on a contract. This is an allowable practice provided that the contractor acts in compliance with all DCAA policies.

41.     Specific infractions of DCAA policies came to the Relator's attention while gathering requested documents for DCAA auditors during the April 2011 audit.

42.     While the Relator prepared the audit response, it came to her attention that NP, Narzikul and Rosch had not been following government policies on progress payments.

43.     The Relator brought this information to Narzikul and Rosch's attention.

44.     Narzikul's response to the Relator was along the lines of "do whatever it takes" to pass the DCAA audit since the success of NP Precision depended on receiving government progress payments.

45.     To pass the audit, Narzikul and Rosch presented false documents including forged checks to DOD contracting officer Eddie Thorne and DCAA auditors.

46.     During the course of the audit, the Relator found multiple instances of fraud on the part of the Defendants.

Contract W58RGZ-08-0054 – U.S. Army and Missile Command

47.     The Relator discovered that NP accepted progress payments around the date of April 13, 2011 for work done by contractors S&S Precision and Perry Technology. At the time, NP had not ordered any work from these contractors.

48.     Vice President Nicholas Emper ("Emper"), at Narzikul's direction, requested pro forma invoices for both subcontractors using quotes of $13,000 for S&S Precision and $18,800 for Perry Technology. Emper then printed checks in these amounts to show the auditors. For S&S Precision, Narzikul signed four separate checks in equal amounts of $3,250 (total value $13,000) and presented them to DCAA auditors to convey the appearance that S&S had received progress payments. For Perry Technology, Narzikul signed four separate checks in equal amounts of $4,700 and presented them to DCAA auditors to convey the appearance that Perry Technology had received progress payments. However, Narzikul never remitted these checks to the subcontractors.

49.     NP accepted a $2,800 progress payment for work done by subcontractor Robert Wooler Company. In order to receive the payment, Defendants misrepresented the monetary value of the work that the subcontractor performed.

50.     NP accepted a $69,800 progress payment from DOD for work done by Rexnord Industries ("Rexnord"). Rexnord had only billed NP $25,000. When the DCAA auditors requested a copy of NP's check to Rexnord, Narzikul and Rosch modified the $25,000 check to reflect a payment of $69,800.

Contract W58RGZ-08-0038 – U.S. Army and Missile Command

51.     NP billed DOD $5,180 for work done by Robert Wooler Company ("Wooler"), although Wooler had only billed NP $1,180. Narzikul cut a check to Wooler for $5,180 to show the DCAA auditors, but never remitted the check to Wooler.

52.     Narzikul then falsified invoices and checks to Perry Technologies for $45,375 and S&S Precision for $21,450. After showing the checks to DCAA auditors, Narzikul voided the checks and never paid the subcontractors.

Contract FA8203-08-C-0086 – Hill Air Force Base

53.     NP accepted a progress payment for $19,085 for work performed by TransDynamic Bearings. NP did not remit the full payment to the subcontractor. When the DCAA auditor requested proof of payment to TransDynamic Bearings, Narzikul again cut checks that it never remitted to TransDynamic Bearings.

54.     The contract also contains a prohibition on persons convicted of fraud or other defense-contract-related felonies" clause. In order to avoid issues related to Narzikul's past convictions of defense contracting fraud, NP listed Mr. Emper as the contracting agent.

55.    Narzikul was charged in August 1992 in a nine-count indictment with conspiring to pay kickbacks, mail fraud, obstruction of a criminal investigation, and money-laundering.

56.    On November 15, 1993, Narzikul was sentenced to four months of electronically monitored house arrest, three years' probation, 400 hours of community service, and a $20,000 fine for paying $120,000 in kickbacks to a federal contractor and $19,804 in hush money to a potential witness against him.

Contract FA8203-08-C-0084 – Hill Air Force Base

57.    NP wrote checks to subcontractors National Precision Bearing for $8,215 and Hercules Heat Treating for $6,455 for the purpose of showing DCAA auditors the requested proof of payment to the respective subcontractors. Narzikul presented two separate checks to DCAA auditors that were never sent to National Precision Bearing. In order to show the DCAA auditors proof of payment to Hercules Heat Treating, Narzikul presented the auditors with a check made out to Hercules Heat Treating dated April 29, 2011 for $6,455.15, but never remitted this check to Hercules Heat Treating. Instead, Narzikul sent a check to Hercules Heat Treating, dated April 29, 2011 for an amount of $3,731.

**After the audit**

58.    After the audit, the Realtor continues to observe Defendants' fraudulent embezzlement of progress payments.

59.    On June 25, 2011, NP progress billed the US Army Aviation and Missile Command $72,755 for raw materials provided by Clifford-Jacobs Forgings under Contract W58RGZ-08-0038.

60.     The Department of Defense approved and Defendants accepted a progress payment of $65,480 for the work completed by Clifford-Jacobs Forgings. Farrow observed Defendants use this money for operating costs instead of paying Clifford Jacobs.

61.     On December 2, 2011, Perry Technology billed NP $30,176.50 for Perry Technology's work on the construction of coupling drive shaft parts. NP then progress billed US Army Aviation and Missile Command $27,158 for the work completed by Perry Technology. On January 23, 2012, NP received an electronic funds transfer from US Army Aviation and Missile Command in the amount of $27,158. On January 31, 2012, NP sent a check to Perry Technology for $5,705.65, grossly short of the $27,158 progress payment NP accepted for the work completed by Perry Technology.

**The Relator discovers that Narzikul funnels progress payments to Oakmont Holdings, LP and P-R Finishing Inc.**

62.     Upon further investigation, the Relator discovered that Narzikul paid Oakmont Holdings, L.P. and P-R from NP's operating account without an explanation on NP's books.

63.     These payments to Oakmont Holdings, L.P. and P-R occurred frequently and usually in close temporal proximity to NP's receipt of progress payments.

64.     Upon further investigation, the Relator discovered that Oakmont Holdings, L.P.'s general partner was Oakmont Holdings, LLC.

65.     Oakmont Holdings, LLC's registered address is the same as Narzikul's home address.  Narzikul is a member of Oakmont Holdings, LLC.

66.     Upon further investigation, the Relator discovered that Narzikul was a principal officer of P-R Finishing, Inc.

67.     On December 11, 2009, NP paid Oakmont Holdings, L.P. $14,500.00 without providing an explanation of the cost in NP's books. On December 31, 2009, NP paid Oakmont Holdings, L.P. $113,742.00.  On January 13, 2010, NP paid Oakmont Holdings, L.P. $14,500.00. During this time, NP received progress payments from the government for work completed by Rexnord.  NP failed to pay Rexnord over $50,000 in progress payments during this time.  Instead of paying subcontractors, Narzikul funneled money into Oakmont Holdings, L.P. and Oakmont Holdings LLC and thereby stole the government's money.

68.     Narzikul has funneled over $616,000.00 from NP into Oakmont Holdings, L.P.

69.     On February 3, 2012, Narzikul paid P-R Finishing Inc. $5,000.00 from NP's operating account.

70.     On February 7, 2012, Narzikul paid P-R Finishing Inc. $10,000.00 from NP's operating account.

71.     On February 16, 2012 Narzikul paid P-R Finishing Inc. $10,000.00 from NP's operating account.

72.     On February 24, 2012, Narzikul paid P-R Finishing Inc. $5,000.00 from NP's operating account.

73.     Narzikul wrote checks to P-R Finishing for the sole purpose of funneling progress payments from the government to Narzikul through a company owned by Narzikul, P-R Finishing Inc.

**NP's misrepresentation of its balance sheet to PNC Bank**

74.     On May 31, 2011, NP applied for a loan with PNC so that it could qualify for certain Department of Defense contracts.

75.     In order to secure the loan, Narzikul and Rosch inflated NP's accounts receivable and lowered its accounts payable to show a more favorable balance sheet.

76.     Narzikul and Rosch also inflated NP's open contract balance by listing the gross amount of its open contracts rather than the net amount after progress payments received.

**NP fails to perform on its contacts**

77.     According to NP's sales backlog, NP has open government contracts with US Army and Missile Command ("AMSAM"), Hill Air Force Base ("H.A.F.B."), Robins Air Force Base (R.A.F.B.), and Naval Inventory Control Point ("NAVICP").

78.     In one of NP's contracts with US Army and Missile Command (Contract W58RGZ-08-D-0125), NP accepted $614,549 in progress payments from the federal government on a contract worth $2,361,450 due for full performance on October 30th, 2009. NP failed to deliver a single part pursuant to its performance on this contract.

79.     In one of NP's contracts with Hill Air Force Base (Contract FA8203-07-C-0018), NP received $644,282 in progress payments from the federal government on a contract worth $719,800, due for full performance on July 8, 2008. NP failed to deliver 207 of the required 236 cylinder assemblies.

80.     In a contract with Robins Air Force Base (Contract FA8509-08-C-0025), NP collected $145,530 in progress payments from the federal government on a contract worth $254,562, due for full performance on June 30, 2010. NP failed to deliver 97 of the 209 parts ordered.

**Narzikul continues to steal progress payment funds by writing himself checks from NP's operating account.**

81.     Narzikul continues to steal progress payments earmarked for subcontractors by writing himself checks from NP's operating account.

82.     On January 4, 2012, Narzikul wrote himself a check for $23,500.00 from NP's operating account.

83.     On January 27, 2012, Narzikul wrote himself a check for $10,000.00 from NP's operating account.

84.     On January 30, 2012, Narzikul wrote himself a check for $3,000.00 from NP's operating account.

85.     On February 15, 2012, Narzikul wrote himself a check for $10,000.00 from NP's operating account.

86.     The above allegations provide specific instances of fraud and misconduct. However, upon information and belief, Defendants have committed hundreds and thousands of instances of extensive and widespread fraud and illegal conduct of the type and nature described above, entitling the government to recover the entire value of all contracts issued to NP.

<u>COUNT I</u>
**Defendants NP, Narzikul, and Rosch Knowingly Presented False or Fraudulent Claims for Payment to the United States in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**

87.     The Relator realleges and incorporates the allegations set forth in paragraphs 1 through 86 above as though fully alleged herein.

88.     NP, Narzikul and Rosch knowingly presented or caused to be presented to the United States and the District of Columbia, false or fraudulent claims, and knowingly failed to

disclose material facts, in order to obtain payment or approval pursuant to its contracts with the U.S. government in violation of 31 U.S.C. § 3729(a)(1)(A).

89.     The United States, unaware of the falsity of the claims and/or statements made by NP, Narzikul and Rosch and in reliance on the accuracy thereof, paid NP, Narzikul and Rosch for such false or fraudulent claims.

90.     By reasons of the acts and conduct of NP, Narzikul and Rosch in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered actual damages, including the amounts paid in response to all such fraudulent claims for payment.

91.     NP, Narzikul and Rosch submitted claims for payment to the government pursuant to its contracts with US Army and Missile Command, Hill Air Force Base, Robins Air Force Base, and Naval inventory Control Point.

92.     The claims NP, Narzikul and Rosch submitted for payment were false, and they knew of the claims' falsity.  NP, Narzikul and Rosch had knowledge of the claims' falsity.  The Relator verbally and in writing notified Narzikul and Rosch of the underlying claims' falsity.

93.     The U.S. government would not have paid, or would have not been obligated to pay NP, Narzikul and Rosch pursuant to the false claims they submitted for payment.

94.     The United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT II
### Defendants NP, Narzikul, and Rosch Knowingly Committed Fraud in the Inducement of Contract with the United States in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

95.     The Relator realleges and incorporates the allegations set forth in paragraphs 1 through 86 above as though fully alleged herein.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. Amy Farrow v. NP Precision Inc. et al.*
17

96.     NP, Narzikul and Rosch knowingly made or caused to be made to the United States and the District of Columbia, false or fraudulent claims, and by failing to disclose material facts, in order to induce the United States into contract and payment in violation of 31 U.S.C. § 3729(a)(1)(B).

97.     The United States, unaware of the falsity of the claims and/or statements made by NP, Narzikul and Rosch and in reliance on the accuracy thereof, paid NP, Narzikul and Rosch for such false or fraudulent claims.

98.     By reasons of the acts and conduct of NP, Narzikul and Rosch in violation of 31 U.S.C. § 3729(a)(1)(B), the United States has suffered actual damages, including the amounts paid in response to all such fraudulent claims for payment.

99.     NP, Narzikul and Rosch indicated that NP was "woman-owned" small business in contracts with the government.

100.    NP listed Nicholas Emper and Sandra Rosch on government contracts in order to avoid issues with Narzikul's criminal background.

101.    Narzikul and Rosch falsified NP's banking records in order to qualify for government contracts.

102.    The U.S. government would not have paid, or would not have been obligated to pay, NP's claims pursuant to the contract(s) had it known of NP's false certifications.

103.    The United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT III
**Defendants Conspired to Knowingly Present a False or Fraudulent Claim for Payment or Approval by the United States and Made Use of a Fraudulent Claim in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**

104.    The Relator realleges and incorporates the allegations set forth in paragraphs 1 through 86 above as though fully alleged herein.

105.    As set forth above, and in connection with the foregoing scheme, Defendants conspired to submit false claims for payment by the United States in violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(C)

106.    The United States, unaware of NP, Narzikul and Rosch's conspiracy to make false claims and/or statements, paid Defendants for such false or fraudulent claims.

107.    By reasons of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1)(C), the United States has suffered actual damages, including the amounts paid in response to all such conspiracy.

108.    Narzikul and Rosch conspired to create false checks to reflect payments made to NP's subcontractors and presented these checks to DCAA auditors.

109.    Narzikul and Rosch funneled progress payments earmarked for subcontractors of NP to Oakmont Holdings L.P., Oakmont Management LLC, and P-R Finishing, all entities from which Kenneth Narzikul used as a vehicle to retain, hold and steal progress payment funds.

110.    Narzikul and Rosch conspired to inflate the amount of work completed by NP's subcontractors in order to retain excess progress payments made by the United States.

111.    The U.S. government would not have paid, or would not have been obligated to pay, NP's claims pursuant to the contract(s) had it known of Narzikul and Rosch's false certifications.

112.    The United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT IV
**Defendants, NP, Narzikul, and Rosch Knowingly Made a False Record or Statement Material to an Obligation to Transmit Property to the United States in Violation of 31 U.S.C. § 3729(a)(1)(G)**

113.    The Relator realleges and incorporates the allegations set forth in paragraphs 1 through 86 above as though fully alleged herein.

114.    As set forth above, and in connection with the foregoing scheme, NP, Narzikul and Rosch knowingly made false records and statements material to an obligation to transmit property to the United States in violation of the False Claims Act 31 U.S.C. § 3729(a)(1)(G)

115.    The United States, unaware of NP, Narzikul and Rosch's false records and/or statements, paid NP, Narzikul and Rosch for such false or fraudulent records and statements.

116.    By reasons of the acts and conduct of NP, Narzikul and Rosch in violation of 31 U.S.C. § 3729(a)(1)(G), the United States has suffered actual damages, including the amounts paid in response to all such records and statements.

117.    NP, Narzikul and Rosch knowingly made false records and statements to DCAA auditors and to the United States regarding NP's ability to perform on its contractual duties with the United States. NP was unable to perform on a majority of its contracts with the United States and NP, Narzikul and Rosch knew of this incapacity to perform and transmit property pursuant to NP's contracts.

118.    The U.S. government would not have paid, or would not have been obligated to pay, NP's claims pursuant to the contract(s) had it known of NP, Narzikul and Rosch's false certifications.

119.     The United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

### COUNT V
**NP Retaliated Against Farrow for Engaging in Protected Conduct in Violation of the False Claims Act 31 U.S.C. § 3730(h)**

120.     The Relator realleges and incorporates the allegations set forth in paragraphs 1 through 86 above as though fully alleged herein.

121.     As set forth above, and in connection with the foregoing scheme, NP retaliated against the Relator for her investigation into the Defendants' fraudulent conduct.

122.     Farrow engaged in activity protected under the False Claims Act by engaging in lawful acts in the furtherance of a *qui tam* action under the FCA and other efforts to stop NP's violation of the False Claims Act.

123.     Farrow engaged in protected activity by making disclosures regarding NP's misconduct underlying the instant *qui tam* action.

124.     Farrow engaged in protected activity by investigating the legality and propriety of NP's conduct.  Farrow repeatedly spoke with colleagues to determine whether NP's conduct was acceptable.

125.     Farrow's investigation and disclosures led to the instant *qui tam* action.

126.     Farrow is an "employee" or "contractor" and NP is an "employer" as the terms are defined by the False Claims Act.

127.     NP demoted Farrow by making Farrow an independent contractor. Narzikul singled Farrow out for enmity and harassment.

128.     Narzikul informed Farrow that he planned to "phase out" her position with NP.

129.    Narzikul's failure to restore Farrow to her former position forced Farrow to resign on April 3, 2012.

130.    To redress the harms she has suffered as a result of the acts and conduct of NP in violation of 31 U.S.C. § 3730(h), Farrow is entitled to reinstatement with the same seniority status that Farrow would have had but for the discrimination, damages and compensation for any special damages, including emotional distress and any other damages available by law including litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, the Relator, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and pray that judgment be entered against Defendants for violations of the federal False Claims Act Counts as follows:

(a) In favor of the United States against the Defendants for treble the amount of damages to the federal government from the submission of false claims and the maximum civil penalties for each violation of the False Claims Act;

(b) In favor of the Relator for the maximum amount pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney fees and costs incurred by the Relator;

(c) For all costs of the False Claims Act civil action;

(d) In favor of the Relator for all compensatory and punitive damages, including personal injury damages for pain and suffering and loss of reputation, back pay, and interest, and attorneys' fees and costs to which he is entitle pursuant to 31 U.S.C. § 3730(h)

(e) In favor of the Relator and the United States for further relief as this court deems to be just and equitable;

(f)  Such other relief as this Court deems just and appropriate.

Respectfully Submitted,

David Scher, DC Bar No. 474996
R. Scott Oswald, DC Bar No. 458859
*Counsel for the Plaintiffs*
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
dscher@employmentlawgroup.com
soswald@employmentlawgroup.com

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Farrow hereby demands a jury trial.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via UPS,

on this 18th day of May 2012, upon:

Eric Holder, Esq.
Attorney General of the United States
Office of the Attorney General, Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Ronald C. Machen, Jr., Esq.
United States Attorney for the District of Columbia
United States Attorney's Office
555 4th Street, NW
Washington, DC 20530

Jennifer Short, Esq.
Assistant United States Attorney
United States Attorneys' Office
555 4th Street, NW
Washington, DC 20530



David L. Scher

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States of America ex rel. Amy Farrow v. NP Precision Inc. et al.*
25